**In re Timothy Mack TERRELL, Debtor.**

**Timothy Mack TERRELL, Plaintiff,**

v.

**Valeria Jo TERRELL, James B. Brien, Jr., Defendants.**

**Bankruptcy No. 5–89–00045.**
**Adv. No. 5–89–0009.**

United States Bankruptcy Court,
W.D. Kentucky.

Oct. 26, 1989.

Sandra D. Freeburger, Sebree, Ky., for plaintiff.

James B. Brien, Jr., Mayfield, Ky., for defendants.

## MEMORANDUM–OPINION

J. WENDELL ROBERTS, Chief Judge.

This adversary proceeding is before the Court pursuant to a complaint filed by Timothy Mack Terrell ("debtor") seeking a judgment that certain debts arising from the parties' divorce are dischargeable in bankruptcy under the provisions of 11 U.S.C. § 523(a)(5). The Court has jurisdiction in this adversary proceeding under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. The dischargeability action is a core proceeding which the Court may hear and determine, 28 U.S.C. § 157(b)(1) and (b)(2)(I). Having conducted a full trial in this matter, the Court now enters its findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## BACKGROUND

On July 27, 1988, the Circuit Court of Graves County entered a Judgment of dissolution of marriage in the case of *Valeria Jo Terrell v. Timothy Mack Terrell*, Civil Action No. 87–CI–347. That Judgment provides that Timothy Terrell: (1) hold his ex-wife harmless on a $19,996.02 obligation due to First National Bank; (2) pay an attorney's fee of $1,000.00 to Jim Brien, Jr., who was Valeria Terrell's divorce attorney; (3) pay $200 per month for the maintenance and support of Valeria Jo Terrell for a period of two years beginning August of 1988 or until such time as she remarries or dies; and (4) pay Valeria Terrell's debt to the Surgical Group. In addition, during the divorce proceeding, the Graves Circuit Court entered a Pendente Lite Order directing Tim to pay, among other things, certain mortgage payments and utility bills associated with the marital residence.

On January 30, 1989, Timothy Terrell filed for protection under Chapter 7 of the Bankruptcy Code. He then filed this adversary proceeding to determine the dischargeability of the debts set forth above. The complaint alleges that the Circuit Court did not intend to create obligations to Valeria Terrell which would be nondischargeable pursuant to 11 U.S.C. § 523(a)(5). Further, the debtor alleges that the obligations mandated by the divorce decree place an unreasonable financial burden upon him, considering his current financial circumstances.

In response, Valeria Terrell has counterclaimed against the debtor alleging that all of the debts are in the nature of alimony,

maintenance or support and, therefore, nondischargeable pursuant to § 523(a)(5) and § 727. A hearing on the merits of these contentions was conducted on September 25, 1989.

## FINDINGS OF FACT

Timothy and Valeria Terrell were married in March of 1978. From the marriage, two children were born. When the divorce decree was entered, the children were nine (9) and seven (7) years of age. Custody of the children was granted to Valeria Terrell.

Valeria Terrell graduated from high school and attended college for two years prior to the parties' marriage. In 1978, she quit college to better care for her husband, home and later, her children. At various times throughout the marriage, Valeria obtained part-time work earning minimum wage. Presently, she is a full-time student enrolled in a nursing training program at Paducah Community College seeking to obtain licensure as a registered nurse. She plans to graduate in May of 1991.

Valeria's current income consists of $350.00 per month for child support for her two children and $200.00 per month in alimony, although she testified she has received neither amount consistently during the last six months. Valeria also receives a $1,150.00 Pell grant per semester for her schooling which goes toward payment of tuition, books, etc. As for her expenses, she testified that she pays $174.57 each month to the first mortgage holder on her house. Other expenses include homeowner's insurance, taxes and maintenance on her house plus child care for her two children. She receives food stamps for the children.

As a result of the divorce proceeding, the State Court awarded the marital residence valued at $40,000.00 to Valeria along with approximately $2,362.00 worth of personal property. Valeria was ordered to assume an $18,039.43 debt owed to First Federal which was secured by a first mortgage on the marital home. The total amount of other liabilities she assumed was $10,554.55. After subtracting the liabilities from the assets, Valeria Terrell's net worth at the time of the divorce equalled $13,768.52.

Tim Terrell is 31 years old and is employed at Kenlake Foods in Murray, Kentucky. At the time the divorce decree was entered, Tim earned $440.00 per week, however, his income has increased to $483.20 per week. According to the testimony, Tim's monthly take home pay is $1,564.15. His monthly living expenses total $1,066.95.

As a result of the parties' divorce, Tim was awarded a 1982 Pontiac 2000, a 1980 GMC pickup truck, a 1984 Kawasaki, his pension plan from Kenlake Foods and other items of personal property for a total value of $13,845.00. It should be noted that Tim also received a Monte Carlo SS and a 1982 Cavalier in the divorce. However, the liens against those vehicles equalled the value of the property and, therefore, the Court has chosen not to include them as assets or liabilities. In addition, Tim was ordered to pay debts to J.C. Penney and The First Place in the total amount of $200.00. A subtotal of Tim's net worth up to this point is calculated to be $13,645.00.

However, in the divorce decree, the State Court further ordered Tim to hold Valeria harmless on the $19,996.02 debt to First National Bank since Tim incurred this debt "by reason of his illegal acts in the state of Tennessee relating to the sale of an automobile with an altered identification number, which resulted in a criminal conviction and fine to the state of Tennessee, and that a portion of that indebtedness was incurred when the respondent purchased various vehicles which he later transferred to a business associate, Scott Reese, and those assets were then later transferred by Scott Reese to respondent's brother and later transferred by respondent's brother into the name of respondent's present girlfriend." Divorce Decree at page 11. The State Court found that because of the debtor's actions, the indebtedness was not solely a marital debt and, therefore, the debtor should be responsible for this debt and was required to take any action necessary to remove the mortgage lien against the marital house.

The State Court also ordered Tim to pay all of Valeria Terrell's medical bills incurred as a result of her gallbladder surgery in December of 1987 and $1,000 in arrearages of interest on the marital residence pursuant to the State Court's previous order. Finally, Tim was ordered to pay $350 per month as child support and $200 per month for a period of two years for maintenance for Valeria as well as $1,000 toward her legal fees.

The issues which this Court must determine in rendering a judgment in this adversary proceeding are as follows:

(1) Whether the provision in the divorce decree requiring the debtor to pay the $19,996.02 obligation to First National Bank represents an obligation in the nature of alimony, maintenance or support;

(2) Whether the $1,000 attorney's fee to Jim Brien represents a nondischargeable support or maintenance obligation;

(3) Whether the $200 monthly maintenance to Valeria Terrell creates an obligation that is in the nature of alimony, maintenance or support;

(4) Whether certain utility payments which Tim was ordered to pay during the pendency of the State Court proceeding are dischargeable in this bankruptcy proceeding; and

(5) Whether the debtor should be denied a discharge of all of his debts pursuant to 11 U.S.C. § 727.

## CONCLUSIONS OF LAW

In addressing the first four issues, the starting point for the Court's analysis is 11 U.S.C. § 523(a)(5) which provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with the separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by governmental unit, or property settlement agreement, but not to the extent that—

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support;

Clearly, in determining what constitutes alimony, maintenance or support, bankruptcy courts should look to federal law rather than state law. *Long v. Calhoun,* 715 F.2d 1103, 1111 (6th Cir.1983); *Singer v. Singer,* 787 F.2d 1033 (6th Cir.1986).

The § 523(a)(5) exception to discharge departs from the general fresh start policy of the Code and "enforces an overriding public policy favoring enforcement of familial obligations." *Shaver v. Shaver,* 736 F.2d 1314, 1315–16 (9th Cir.1984). In determining the dischargeability issue, the Bankruptcy Court is charged with the duty to determine the true nature and substance of an obligation within the context of 11 U.S.C. § 523(a)(5) regardless of the characterization placed on it by the parties' agreement or the state court proceeding.

Although there currently exists a serious debate among the Circuits with regard to the proper analysis of nondischargeability claims under § 523(a)(5), the controlling law in the Sixth Circuit is set forth in the decisions of *Long v. Calhoun,* supra and *Singer v. Singer,* supra.[1] In *Calhoun,* the

---

**1.** There is presently a split of authority among the Circuits on the question of whether a bankruptcy court in a § 523(a)(5) nondischargeability action should take into consideration the parties' current financial situation. The Sixth Circuit in the *Calhoun* and *Singer* opinions represents the clear minority view when it allows a bankruptcy court to inquire into the parties' changed financial circumstances. The Second, Eighth and Eleventh Circuits have expressly re-

jected the *Calhoun* analysis. See *Forsdick v. Turgeon,* 812 F.2d 801 (2nd Cir.1987); *In re Draper,* 790 F.2d 52 (8th Cir.1986) and *In re Harrell,* 754 F.2d 902 (11th Cir.1985).

While the other Circuits have not expressly rejected the 'relevancy of needs' test, some Circuits have discussed the issue and noted its irrelevancy in a § 523(a)(5) action. For example, the court in *In re Bell,* 61 B.R. 171 (Brktcy.

debtor appealed a bankruptcy court's summary judgment that his assumption of certain obligations pursuant to a separation agreement between him and his former wife were in the nature of support or alimony and, therefore, nondischargeable debts. In reaching this result, the Bankruptcy Court concluded that the language of the separation agreement controlled the issue of dischargeability unless the compelling weight of evidence suggested that the agreement would work a manifest injustice. The Sixth Circuit disagreed, holding that the Bankruptcy Court applied an incorrect legal standard by improperly shifting the burden of proof from the plaintiff/spouse to the debtor to show that the agreement does not mean what it says or work a manifest injustice. The Sixth Circuit ruled that:

> Placing this degree of reliance upon the language of the parties' agreement and placing the burden of persuasion on the debtor are legal errors which may not be separated from the court's factual findings in this case. *Calhoun*, 715 F.2d at 1111.

S.D.Tex.1986) (5th Circuit) held that bankruptcy courts should refrain from making inquiries into the relative financial positions of the parties. In *In re Chedrick*, 98 B.R. 731 (W.D.Pa. 1988) (3rd Circuit), the Court stated that "to allow a bankruptcy court to take into consideration the parties' changed financial circumstances in determining whether an obligation constitutes alimony, maintenance or support would be to rule that such agreements are dischargeable in nearly every case. In most cases, by the time a debtor has filed for bankruptcy, the economic condition of his or her ex-spouse will be at least on par with, if not more favorable than, that of the debtor, who, after all, has been driven to bankruptcy by his debts. The debtor's proper remedy in this case is not to avoid this debt through bankruptcy, but to petition to the court with jurisdiction over his or her divorce decree for a modification of any such agreement in light of changed circumstances. *Chedrick* at page 734.

The Second Circuit in *Forsdick v. Turgeon*, supra, recently discussed the issue of the relevancy of 'changed circumstances'. The Court stated that "an inquiry of the sort urged by the husband would put federal courts in the position of modifying the matrimonial decrees of state courts, thus interfering with the delicate state systems for dealing with the dissolution of marriages and the difficult and complex results that flow therefrom. State-crafted family law should not be disturbed by federal court inter-

The Sixth Circuit reversed the judgment of the Bankruptcy Court and remanded the case back to Bankruptcy Court for further proceedings.

In its Opinion, the Sixth Circuit articulated a four-part test to assist the Bankruptcy Court in determining whether an award is in the nature of alimony or a property settlement. The elements of this test are as follows:

(a) Whether the **intent** of the state court or the parties was to create a support obligation;

(b) Whether the support provision has the actual **effect** of providing necessary support;

(c) Whether the amount of support is so excessive as to be **unreasonable** under traditional concepts of support; and

(d) If the amount of support is unreasonable, **how much** of it should be characterized as nondischargeable for purposes of federal bankruptcy law. *Calhoun*, 715 F.2d at 1109–1111.

vention unless there is an unmistakable mandate from Congress to do so in order to achieve a valid federal objective.

We find no such mandate here. To the contrary, Congress has clearly required the bankruptcy court to protect the rights of a former spouse receiving alimony at the expense of a debtor seeking a fresh start. The husband's argument would turn this legislative intent on its head by having the bankruptcy court entertain arguments about, and deciding issues of nondischargeability on the basis of, a continuing need for support instead of protecting the award previously found by the state courts to be appropriate. Had Congress wished the bankruptcy courts to consider the current impact of its decision on the parties in determining whether an alimony debt is dischargeable, it could easily have so provided. Indeed, for educational loan obligations Congress did exactly that in § 523(a)(8) which treats student loans as nondischargeable unless "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependence". *Forsdick v. Turgeon*, 812 F.2d at 803–804.

This Court agrees with the arguments in support of the majority view that a bankruptcy court should not consider changed financial circumstances, however, it is bound by *Long v. Calhoun.*

In applying the *Calhoun* analysis, our initial inquiry must be whether the State Court or the parties to the divorce intended to create an obligation to provide alimony, support or maintenance. Since this was a contested proceeding in State Court, we will focus our attention on a determination of the State Court's intention in its distribution of certain debts and obligations to the parties. In accomplishing this feat, *Calhoun* allows us to look to factors a state court considers in determining whether support or alimony should be awarded. These factors include:

(1) The nature of obligations assumed (provision of daily necessity indicates support);

(2) The structure and language of the parties' agreement or the Court's Decree;

(3) Whether lump sum or periodic payments were also provided;

(4) Duration of the marriage;

(5) The existence of children from the marriage;

(6) Relative renting powers of the parties;

(7) Age;

(8) Health and work skills of the parties;

(9) The adequacy of support absent the debt assumption;

(10) Evidence of negotiation or other understandings as to the intended purpose of the assumption.

*Calhoun*, 715 F.2d at pages 1107–1108. *Lovett v. Lovett*, 688 S.W.2d 329 (Ky.1985); KRS 403.200. If the Court concludes that the State Court did not intend to create an obligation to provide support, then the inquiry ends and the Court must deem the obligations dischargeable in bankruptcy.

However, if the Bankruptcy Court finds that the obligations were intended as support, it must next inquire whether such assumption has the effect of providing the support necessary to insure that the daily needs of the former spouse and any children of the marriage are satisfied. *Calhoun* at page 1109. In making such a determination, the *Calhoun* court stated that the bankruptcy court should look to the 'practicable effect' of the discharge of each loan upon the dependent spouse's ability to sustain her daily needs. If without the loan assumption the spouse could not maintain the daily necessities, such as food, housing and transportation, the effect of the loan assumption may be found 'in the nature of' support for purposes of the Bankruptcy Code. *Calhoun* at page 1109. If the obligations are not found necessary to provide such support, the inquiry ends and the debtor's obligation must be discharged.

In order to determine whether an obligation has the 'effect' of providing the support necessary to the former spouse, cases decided subsequent to *Calhoun* seem to indicate that a look at both parties' changed circumstances is mandated under *Calhoun*. *In re Singer*, 787 F.2d at 1038. However, a close reading of *Calhoun* on page 1109 of the opinion and in footnote #10 implies that the Bankruptcy Court only look at the circumstances of the non-debtor/spouse at the time the divorce decree was entered to determine whether the obligations awarded were necessary to provide support. Footnote #10 in *Calhoun* states:

We recognize that such inquiry may, in effect, modify a judgment or decree of a state court. In view of the congressional mandate to apply a federal standard, this cannot be avoided. Actual interference, however, will probably be minimal. In a contested case, the likelihood that the state court would have awarded support where it was unnecessary is sufficiently remote that such interference by the bankruptcy court will seldom be necessary. When, as in the present controversy, the decree is not the result of a contested case but merely incorporates the parties' agreement, the concern for comity is of less importance. To allow the parties' characterization of the loan assumption in such cases to control pro forma would permit the debtor to agree to forego his rights under the bankruptcy laws. *Calhoun*, at page 1109.

The *Calhoun* Court explains that in a contested proceeding, it is highly unlikely that a state court judge would award support to a former spouse if it was not neces-

sary for her daily subsistence. However, Judge Guy, in his concurring opinion in *In re Singer*, supra at page 1038, interpreted *Calhoun* as requiring a look at the former spouse's current financial situation.

■ In any event, if the Court concludes that the obligations assumed by the debtor are not necessary to provide support, the inquiry ends and the debtor's obligations must be discharged. If on the other hand, the Court determines that the obligations do have the effect of providing necessary support, the Bankruptcy Court must finally determine whether the amount of the support is so excessive as to be manifestly unreasonable under traditional concepts of support. *Calhoun* at page 1110. Obviously, in order to make such a determination, the Court must look to the debtor's current financial situation. If the Bankruptcy Court finds the debtor's assumed obligations too excessive to be fairly considered 'in the nature of' support, it must then determine a reasonable amount to be deemed nondischargeable.

Having reviewed the law in this area, the Court shall now apply it to the facts in this case.

### $19,996.02 Obligation to First National Bank

■ A provision in a divorce decree ordering a spouse to be responsible for and hold the other spouse harmless on a debt incurred during the marriage may be in the nature of maintenance and support or may be in the nature of a property settlement. *In re Young*, 72 B.R. 450 (Bkrtcy.D.R.I. 1987). In determining the dischargeability of the award, the Bankruptcy Court shall conduct a *Calhoun* analysis by first determining whether the State Court intended the debt assumption to be in the nature of support or alimony. After a thorough review of the evidence, the Court concludes that Valeria has satisfactorily proven that the State Court did intend to create a maintenance obligation by assigning the $19,996.02 obligation to Tim.[2]

In making this determination, the Court has reviewed the state court divorce decree and notes that even though the debtor's assumption of the $19,996.02 debt is found in the section of the decree relating to property division, it represents an attempt to provide additional support to Valeria by freeing up funds that otherwise would go towards payment on the debt. As stated in *Calhoun*, when the effect of the assumption of the debt is to provide what is necessary to ensure that the children's daily needs are satisfied and without the assumption of the debt, the necessities of life could not be maintained, the obligation is support. *Calhoun*, supra at 1109.

Here, Valeria could not make the second mortgage payment at the time the divorce decree was entered and if the debtor had not assumed the $19,996.02 obligation, the mortgagee would have foreclosed, causing Valeria and her two children to seek other shelter which undoubtedly would have been of lesser quality than the housing to which they were currently accustomed. Tim testified that while he feels responsible for providing shelter for his children, he would like to see his ex-wife sell the marital house and find a small apartment in order to reduce her living expenses. Tim currently shares a very basic two bedroom duplex apartment with his wife and step-child, paying $285.00 per month in rent. He testified that there are other apartments in the city that rent for much less than $285.00 that would be appropriate living accommodations for his ex-wife and two children, even though he denied such apartments would serve his own needs.[3]

Furthermore, excluding the $19,996.02 obligation, distribution of assets and liabilities created an almost identical net worth for both Tim and Valeria. According to this distribution, Valeria's net worth equalled $13,768.52. Tim's net worth equalled $13,645.00. However, this figure is somewhat reduced after taking into consid-

---

**2.** The spouse who is objecting to the dischargeability of the debt bears the burden of proof. *Calhoun*, supra at page 1111 note 15.

**3.** The Court wonders whether Tim is as concerned about the accommodations for his own children as he is for himself, his new wife and his step-child.

eration the State Court's order requiring Tim to make current the $19,996.02 obligation to First National Bank, to pay Valeria's medical bills concerning her gallbladder surgery and to pay various utility bills. This slightly unequal distribution of assets and liability is not surprising in light of the parties' differences in job experience. If we had included the debtor's assumption of the $19,996.02 note in the division of property, Tim's net worth as a result of the divorce would have been a negative $5,000.00. For this reason and the reasons stated above, we find the obligation to be in the nature of support and alimony to Valeria.

■ The next inquiry we must make is whether the debt assumption has the effect of providing the support necessary to ensure that the needs of Valeria and her children are satisfied. The testimony at trial was clear that Valeria's current income consists only of her monthly child support and alimony payments from her ex-husband in the total amount of $550.00 and the Pell grant. Of this amount, at least $500.00 goes for home expenses including payment of a first mortgage. Thus, regardless of whether Valeria's financial condition should be assessed from the time the divorce decree was entered or as it currently exists, the Court is convinced that the debt assumption is necessary to provide necessary support for Valeria and the two children.

■ The final matter for determination with regard to this obligation is whether the debt assumption is manifestly unreasonable under traditional concepts of support. As noted in *Calhoun*, if the circumstances of the debtor have changed from the time the obligation to the former spouse was created so as to make such support now inequitable, the Bankruptcy Court may consider the debtor's current general ability to pay insofar as it relates to the debtor's continuing obligation. It is not intended that the Bankruptcy Court sit as a super divorce court; rather, the purpose of such inquiry is to ensure that the degree of support represented does not clearly exceed that which might reasonably

have been awarded as support by a state court after a contested divorce. *Long v. Calhoun*, 715 F.2d at 1110 fn. 12.

The Court's review of the record indicates that the debtor's financial circumstances have not changed so drastically as to relieve him of this obligation. At the time the divorce decree was entered, the debtor was making $440.00 per week. Now, his income has increased to $483.20 per week. Further, as a result of this bankruptcy, the debtor has been able to discharge many of his obligations and, therefore, improve his cash flow on a month to month basis. While it is true that the debtor's current expenses including his expenses for his current wife and her child, exceed his current take home pay, many individuals live from paycheck to paycheck regardless of their incomes. The debtor may have to seek a secondary source of income as he did during his first marriage and/or engage in 'belt tightening'. Having satisfied the requirements of the *Calhoun* test, the Court concludes that the $19,962.02 obligation is in the nature of support and alimony and, therefore, nondischargeable in bankruptcy.

### ATTORNEYS FEES

■ Section 523(a)(5) provides that a debtor is not discharged from debts to a former spouse in connection with a divorce decree which are in the nature of alimony, maintenance or support. Paragraph 19 of the Decree of Dissolution of Marriage ordered Tim to pay one-half of Valeria's legal expenses, not to exceed the sum of $1,000.00. The divorce decree does not specifically state whether the award of attorney's fees is in the nature of alimony, maintenance or support or in the nature of a property settlement.

However, on page 15 of the divorce decree, the State Court found that Valeria was without sufficient funds, including a division of marital property, to pay all of her legal expenses and, therefore, the Court ordered Tim to be responsible for one-half of Valeria's legal expenses. Based on these findings, this Court holds that the State Court did intend to provide

support to Valeria by ordering Tim to assist in the payment of these legal fees. Moreover, as the State Court so held, the award of attorney's fees is in the nature of support and, therefore, nondischargeable.

## $200.00 MONTHLY ALIMONY PAYMENTS

■ Here, Tim has not disputed the fact that this obligation was intended to provide support for Valeria for two years while she was in school. Tim also concedes that this monthly alimony is necessary for Valeria's daily living needs. His main contention is that the monthly alimony payment is unreasonable considering his present financial circumstances. As previously discussed, this Court does not feel that Tim would be unduly burdened by continuing his $200 per month alimony payment to Valeria until the obligation ceases in approximately ten months or July of 1990. Tim presented himself at trial to be a young, healthy, able-bodied man who seemed to be quite capable of generating extra income if the circumstances so required. For these reasons, the Court declines to reduce or eliminate the $200 monthly alimony payment and declares such debt to be nondischargeable in bankruptcy.

## UTILITY BILLS

■ The last obligation the Court must consider is certain utility bills that Tim was directed to pay by the State Court during the pendency of that divorce proceeding. Tim argues that the fact that these bills have already been paid by Valeria indicates that Tim's reimbursement of these bills is no longer necessary for the support of Valeria. We simply disagree. The testimony at trial was that Valeria had to borrow the money from her relatives to pay these bills and these debts are currently outstanding. If Tim reimburses Valeria for the bills, Valeria will then be able to repay the lender. Accordingly, although the Court has not specifically addressed the other three elements in the *Calhoun* test, it concludes that the State Court's order requiring the debtor to pay the utility bills was in the

nature of support and alimony and, therefore, nondischargeable in bankruptcy.

## DENIAL OF DISCHARGE UNDER SECTION 727(a)

■ In her counterclaim against Tim, Valeria has objected to his discharge under § 727(a)(2) of the Bankruptcy Code. That section states, in part, as follows:

(a) The Court shall grant the debtor a discharge unless—

(2) The debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or as permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) Property of the debtor within one year before the date of the filing of the petition; or

(B) Property of the estate, after the date of the filing of the petition.

Valeria has alleged that on March 4, 1988, which was within one year of the date of the filing of the petition, Tim transferred a 1982 Pontiac, a 1980 GMC pickup and a 1984 Kawasaki to his girlfriend, who is now his wife. According to Paragraph 14 of the divorce decree, the State Court concluded that the $19,962.02 obligation to First National Bank was partly incurred as a result of Tim's transfer of certain vehicles to a business associate, Scott Reese, who later transferred them to Tim's brother who later transferred them to Tim's girlfriend, now wife. At trial, when Tim was asked questions regarding the nature of the transfers, he was continually nonresponsive to the questions asked. He did testify that ultimately the vehicles were sold for a total amount of $6,800.00 which was applied mostly to the First National Bank debt. He then stated that he originally transferred these vehicles so as to have assets he could use since he was foreseeing an expensive divorce down the road. When asked about his failure to disclose the transfer of the vehicles on his bankruptcy petition, Tim stated that he didn't think he was transferring the cars. While the Court feels that the debtor's

actions regarding the transfer of the vehicles border on fraud, the evidence does not clearly and convincingly prove that Tim intended to defraud his creditors. Accordingly, Tim should not be denied a discharge of all of his debts pursuant to § 727(a)(2).

In reaching these conclusions, the Court has considered all the evidence and arguments of counsel, regardless of whether they are specifically referred to in this Opinion.

This Memorandum–Opinion constitutes findings of fact and conclusions of law.

An Order consistent herewith will be entered this day.

### JUDGMENT

Pursuant to the attached Memorandum–Opinion,

IT IS ORDERED AND ADJUDGED that the debt ordered by the Graves Circuit Court Divorce Decree ("Divorce Decree") entered on July 27, 1988 to be paid by the debtor, Timothy Mack Terrell, in the amount of $19,996.02, be, and hereby is declared nondischargeable in bankruptcy in accordance with provisions of 11 U.S.C. § 523(a)(5).

IT IS FURTHER ORDERED AND ADJUDGED that the Divorce Decree award to Valeria Jo Terrell for an attorney's fee in the amount of $1000.00 be, and hereby is declared nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(5).

IT IS FURTHER ORDERED AND ADJUDGED that the Divorce Decree award of alimony to Valeria Jo Terrell in the amount of $200.00 per month for a two year period be, and hereby is declared nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(5). All past-due alimony for the months of May (one-half), June, July, August, September and October of 1989 in the total amount of ELEVEN HUNDRED DOLLARS ($1100.00) shall be paid to Valeria Terrell in a lump-sum payment within ten (10) days of entry of this Judgment.

IT IS FURTHER ORDERED AND ADJUDGED that the child support award in the amount of $350.00 per month payable to Valeria Terrell be, and hereby is declared nondischargeable in bankruptcy in accordance with provisions of 11 U.S.C.

§ 523(a)(5). All past-due child support for the months of December (one-fourth) and August (one-fourth) in the total amount of ONE HUNDRED SIXTY THREE DOLLARS ($163.00) shall be paid within ten (10) days of entry of this Judgment.

IT IS FURTHER ORDERED AND ADJUDGED that the utility payments in the total amount of TWO HUNDRED TWENTY THREE DOLLARS AND FIFTY CENTS ($223.50) be, and hereby are declared nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(5). Payment shall be made to Valeria Terrell in full within ten (10) days of entry of this Judgment.

IT IS FURTHER ORDERED AND ADJUDGED that Tim Terrell should be, and he is hereby granted a credit against the above amounts in the sum of FOUR HUNDRED EIGHTY FOUR DOLLARS AND SIXTY TWO CENTS ($484.62) representing child support payments previously paid to Valeria Terrell for the six weeks last summer in which the said Tim Terrell had custody of the children.

IT IS FURTHER ORDERED AND ADJUDGED that the counterclaim of Valeria Terrell against Tim Terrell seeking denial of discharge pursuant to 11 U.S.C. § 727 be, and hereby is DISMISSED.

This is a final and appealable judgment and there is no just cause for delay.